UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JAN GREENE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:07-0955 |
| | ) | Judge Echols |
| WESTWOOD PROPERTY MANAGEMENT, | ) | |
| LLC a/k/a WESTWOOD MANAGEMENT, | ) | |
| LLC, ROBERT BLAIR and JUDY BLAIR, | ) | |
| | ) | |
| Defendants. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a case in which Plaintiff, Jan T. Greene, makes claims for unpaid overtime compensation and unlawful retaliation under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq., and claims for breach of contract based on what Plaintiff claims were a failure to pay him an agreed-upon salary, unauthorized deductions from his paycheck, and unpaid commissions. The Defendants are his former corporate employer, Westwood Property Management, LLC, a/k/a Westwood Management, LLC ("Westwood"), its sole member, Robert Blair, and his wife, Judy Blair, its then-human resources manager and bookkeeper.

The Court held a bench trial in this action from December 16-19, 2008, after which the parties were instructed to file proposed findings of fact and conclusions of law. Those proposed findings and conclusions were filed on January 29, 2009.

Having reviewed the parties' proposed findings and conclusions, the record, the exhibits received in evidence, and the testimony of the witnesses, after considering their interests and demeanor, the Court enters the following Findings of Fact and Conclusions of Law. Except where

1

the Court discusses different testimony on a specific issue, any contrary testimony on a specific matter has been rejected in favor of the specific fact found. Further, the Court omits from its recitation facts which it deems to be immaterial to the issues presented.

## I.  FINDINGS OF FACT

During the four day trial, the Court heard evidence on a myriad of topics.  The Court will set forth the facts in three general categories: (a) the facts related to Plaintiff's hiring, job duties and salary; (b) the facts underlying Plaintiff's employment and termination; and (c) the facts relating to the number of hours worked by Plaintiff.  Prior to doing so, however, the Court generally observes that its task was made exceedingly difficult in this case by what appeared to be a biased slanting of facts by almost all witnesses who testified at trial, including the Plaintiff and Defendant Robert Blair.

### A.  Hiring, Salary and Job Duties

1.  At the time of trial, Plaintiff was 43 years old and had a tenth grade education.  He was employed by Westwood from June 28, 2005 until November 9, 2006.

2.  Defendant Westwood is a Tennessee Limited Liability Company engaged in construction, real estate and property management businesses. Westwood conducts a construction business out of Franklin, Tennessee, under the assumed business name of West Main Construction ("West Main").

3.  Defendant Robert Blair is the sole owner of Westwood and is the primary decision-maker with respect to the business of Westwood and West Main.

4.  Defendant Judy Blair is Robert Blair's wife. She was involved in the initial formation of Westwood in 2002 and filed the Articles of Incorporation for Westwood on May 21, 2002.  She

2

resigned as a member and organizer of Westwood on August 1, 2002. Since then, Judy Blair has held no ownership interest in Westwood, and she has had no management responsibility for Westwood. While Plaintiff was employed by Westwood, Judy Blair provided administrative services to Westwood, primarily in the preparation of the company's payroll. However, Judy Blair was not an officer, director, or owner of Westwood, she had no operational control over the business of Westwood, and she had no supervisory authority over Plaintiff or any other Westwood employee.[1]

5. Since the age of 17 or 18, Plaintiff has worked as a handyman, performing maintenance tasks, such as fixing plumbing and electrical problems, installing sheetrock, painting, and doing carpentry work. Prior to his employment with Westwood, Plaintiff owned and operated a small maintenance business called Greene Restoration, in which he did most of the work.

6. In June 2005, Plaintiff responded to an advertisement in the newspaper placed by Westwood which sought maintenance help at West Main Construction. On June 3, 2005, Plaintiff filled out an employment application. Approximately two days later, Plaintiff interviewed with Robert Blair. On June 27, 2005, Robert Blair hired Plaintiff as a Project Manager/Lead Maintenance Technician for West Main Construction. The parties hotly dispute the exact job duties of that position, as well as the compensation Plaintiff was to receive for performing his duties.

7. Plaintiff Greene testified that he was offered $33,600.00 per year salary (with a $1,000 raise after 90 days) for a forty hour week, plus a $200.00 gas allowance per month. Defendant Robert Blair contends that the offer was $31,200.00 per year (with a $1,000.00 raise after 90 days), plus a $200.00 gas allowance, for a total of $33,600.00 per year and that the salary was based upon a 50 hour workweek.

_____

[1]At the time of trial, Defendant Judy Blair operated Ameritax, a small tax business.

3

8.  The Court finds that Plaintiff was offered a forty-hour per week position at $33,600.00 per year (with a $1,000 raise after 90 days) and that he would receive an additional $200.00 per month as a gas allowance.  Support for this finding can be found in Plaintiff's testimony wherein he indicated that he requested $17.00 to $18.00 per hour compensation.  Plaintiff testified that when he was offered the $33,600.00 per year salary, he went home to think about it.  He divided 40 hours per week into the $33,600.00 per year, and came up with an hourly rate of $16.15 per hour.  Plaintiff testified that he accepted the offer of $33,600.00 per year because it was close enough to the amount he requested and he thought there would be opportunity for advancement with Westwood.  Further, on occasion, Plaintiff received "emergency pay" at the rate of $25.00 per hour for work performed on the weekends and it is not apparent that there would be a need for such increased pay if Plaintiff were a salaried employee.

9.  In reaching the finding relating to Plaintiff's salary, the Court has considered Defendant's contrary evidence and specifically the purported job description and the detailed handwritten notes on the back of Plaintiff's application.  The notes indicate that Plaintiff was to receive $33,600.00 a year for the first 90 days (which includes the $200.00 gas allowance, or $31,200.00 in salary without the gas allowance) with a raise of $1,000.00 in 90 days, and that the salary was to be based upon a 50 hour work week.  The notes also indicated that Plaintiff was to receive full time benefits including one week paid vacation after 90 days and three days sick pay annually.  (Pf. Ex. No. 1). The job description was for a Project Manager/Lead Maintenance Technician and indicates "this position is considered a supervisory salaried position with the beginning salary set at $31,200.00 annually and is based on a minimum of 40–50 hours per week. Any employees' pay may be reduced if warranted."  (Pf. Ex. No. 6).

4

10. Defendant Robert Blair testified that the notes on the back of Plaintiff's application were made contemporaneously with the interview and the job description was in existence at the time of Plaintiff's hire. This Court rejects that testimony. No other employee of Westwood had notes about his salary on his application or a job description as specific and exceedingly detailed as the one apparently tailored for Plaintiff. Plaintiff testified he never saw Blair's handwritten notes on the back of his Employment Application or the written job description, that he was unaware of any such notes or job description, and that he never would have accepted $31,200.00 as his annual salary because that would have resulted in his agreeing to $15.00 per hour based on a forty hour week, or about $12.00 per hour for fifty hours per week which would be about what was paid to inexperienced maintenance workers at Westwood. Even Robert Blair conceded that, given Plaintiff's experience, Plaintiff was not an "entry level guy." Further, Plaintiff's final paycheck showed him to be an hourly employee, by listing his hourly rate and the rate of pay for overtime hours.

11. The Court also finds that the title of Project Manager/Lead Maintenance Technician was deceptive insofar as it suggested that Plaintiff was some sort of supervisor. Plaintiff's actual duties involved the maintenance and repair of properties managed by the Defendants. He often worked alone and supervised no one. On occasion, he would take the lead on certain maintenance or repair jobs when he was more familiar with a certain project and the work to be done, but that was no different than other maintenance employees who would also take the lead when they were more familiar with a project and the work to be done. Plaintiff never had the authority to hire or fire any employees, nor was he responsible for scheduling employees or actually directing the employees' work on a day-to-day basis.

5

12.   In reaching the findings relating to Plaintiff's duties, the Court has considered the contrary testimony.  For example, Robert Blair testified that when he hired Plaintiff he told Plaintiff that  he wanted to remove himself from the day-to-day operations of the company and that Plaintiff could have an important future with the company as a supervisor or lead in maintenance.   If that was the original intention of Blair, and/or Plaintiff thought at the time he was hired that he was going to take a lead in the maintenance department, that certainly was not how things turned out.

13.   The Court also rejects the testimony of Steve Pulk ("Pulk") about Plaintiff's job duties. Pulk, who performed various duties for Westwood from the spring of 2003 to the spring of 2008 including managing and scheduling the maintenance and repair work from Westwood's office, testified that while he handled the office responsibilities, Plaintiff was the company's "second brain" in the field and that Plaintiff's primary responsibilities included overseeing jobs, responding to questions in the field from maintenance technicians, exercising judgment and discretion in preparing bids on projects, determining materials and manpower needed for jobs, ordering and purchasing materials, and supervising maintenance technicians in such things as the order of work and how to perform the work.  However, it is clear beyond doubt from the testimony that was presented by other credible witnesses that the actual day-to-day operations were markedly different from the description by Pulk.  Plaintiff essentially worked side-by-side as a co-worker with the other maintenance technicians at West Main, he was treated as a maintenance technician, he acted as a maintenance technician, he was never referred to as a supervisor, and he was never given the authority to assume the role of a supervisor.  It was a only on a rare occasion when Plaintiff was asked to work-up a bid for a job or to schedule workers for a particular job.   Further, when Dwayne Blackmon ("Blackmon")  was hired by Blair in September 2008 supposedly (according to Blair) to take over

6

Plaintiff's duties as project manager and lead person, he was paid an hourly wage. Furthermore, Blackmon testified that when he worked with Plaintiff on a job they worked side-by-side and there was no supervisor or anyone in charge of a particular job, unless there was a co-worker who had already been working on the job and was familiar with the job site and the work needed to be done, in which case that person would take the lead to finish the work on that job.

## B.  Employment and Termination

14. When Plaintiff first took the job at Westwood, he was commuting from Dickson, Tennessee, which is approximately 20 miles from the Westwood office. Shortly after he was hired, Plaintiff decided he could save some money if he moved into an apartment located in a house that the Blairs owned in Brentwood, Tennessee. The parties agreed that Plaintiff would pay rent in the amount of $700 per month, which included utilities. In addition to paying rent, Plaintiff was to perform two hours of lawn work on the property per pay period.

15. Robert Blair testified that he told Plaintiff he could save money on his income taxes by reducing his salary by the amount of the rent, and Plaintiff agreed to a salary reduction of $700 per month. However, Plaintiff testified that the $700 monthly rent would be deducted from his salary, not that his salary would be reduced. The Court finds as a fact that the parties agreed that Plaintiff would pay $700 per month and that the payment would be deducted from his salary, not that his salary would be reduced by $700 per month. The Court does so notwithstanding a "Memo" from Robert Blair which characterizes the agreement as being one of a salary reduction. While that document is dated July 1, 2005, the Court does not believe it was actually written at the time the parties reached their agreement. Again, as with the controverted job description and apartment

7

lease, Plaintiff never saw this memo and never signed it, even though it was supposedly placed in his personnel file to represent an agreement between the parties.

16. Regardless of how the transaction is characterized, Plaintiff, who was paid bi-weekly, had $350.00 taken from his paycheck each pay period. However, Plaintiff's pay stubs do not show the rent as a deduction, but instead indicate that Plaintiff was actually being paid $8,400.00 ($700 X 12 months) less per year. Plaintiff claims he did not understand this and repeatedly complained about it, but those complaints fell on deaf ears.

17. During the first few months of his employment, Plaintiff owned and drove an old 1988 van which was not very attractive. In Robert Blair's view, the van, which would be driven to job sites, did not present a proper image for the company. In October 2005, Blair offered to purchase a truck for Plaintiff's use (personal and business) and allow Plaintiff to pay for the vehicle over time, at six percent interest. On October 27, 2005, Westwood Management, LLC purchased a 1994 Chevrolet truck, Model 3500, with 63,158 miles on it for $11,014.94. Plaintiff agreed to pay $400.00 per month until it was paid off, at which time, for additional consideration of $1.00, Plaintiff would own the truck. The $200.00 per pay period was deducted from Plaintiff's pay, however, as with the amount taken out for rent, the pay stub did not show this as a deduction, thus suggesting that Plaintiff's total income as reflected on his W-2 statement was substantially less than it was.[2] Again, Plaintiff complained but the complaints went unanswered.

_____

[2]Plaintiff was issued a W-2, Wage and Tax Statement for 2005 showing wages of $9,100.01. The 2005 W-2 did not include the $3,500.00 that was deducted from his pay for rent, or the $1,000.00 that was deducted from his pay for the truck payments. Plaintiff's 2006 W-2 Wage and Tax Statement for 2006 showed wages in the amount of $20,800.72 and did not include the $4,000.00 that was deducted from his pay for the truck payments or the $3,850.00 that was deducted for rent.

18. The parties' agreement relative to the truck was never reduced to writing. After Plaintiff continually complained about not having anything in writing, Robert Blair handwrote a "Contract." (Pf. Ex. 11). That "Contract" states that if Plaintiff were to leave the company, the "Contract" would be "null and void" and the truck would be "deamed [sic] stolen." However the "Contract" appears to be incomplete and was not dated or signed by the parties and, in fact, Plaintiff refused to sign the "Contract." The Court therefore finds the "Contract" to be of little evidentiary value.

19. Effective October 15, 2005, Plaintiff received his $1,000.00 increase.

20. Shortly after being hired, Plaintiff was provided with a company-issued cellphone, a Home Depot card, a VISA credit card and a company-issued fuel card. The credit cards and the cellphone were to be used for business-related purposes. Plaintiff signed agreements relating to the use of the credit cards and the cellphone and understood they were to be used only for business purposes and that all personal charges for the use of the cell phone or credit cards would be deducted from Plaintiff's paycheck. Plaintiff also understood that if he exceeded the $200 gas allowance during a given month, the excess would be deducted from subsequent paychecks. Plaintiff further understood that if he made unauthorized charges on the credit cards, he could be terminated.

21. Within the first month of his employment, Plaintiff exceeded the $200.00 fuel allowance. Plaintiff also used the company issued credit cards for personal use. Plaintiff claims that it was often necessary to go over the $200.00 monthly fuel allowance because his work required a lot of travel to various work sites. He also claims that Robert Blair assured him that $200 a month for gasoline was generally sufficient, but if it proved not to be, the company would consider additional allowances on a case-by-case basis. Further, Plaintiff claims that because of the deductions being taken from his paycheck, he could not live paycheck to paycheck, and sometimes

9

had to use the credit card to buy food until the next pay check.  He claims Pulk told him that this would not be a problem because any amount charged for personal use would be deducted from Plaintiff's paycheck.

22.  From the start of his employment until the credit cards were cancelled, Plaintiff almost always exceeded the $200 fuel allowance, whether the reason was because he used more than that amount of gas per month, or he used the fuel cards for things other than gasoline needed for work. For example, in July 2005, Plaintiff exceeded the monthly fuel limit by $81.00, in August 2005, Plaintiff exceeded his monthly allowance by $123.98, and in October 2005, Plaintiff exceeded his fuel allowance by $27.22 on the fuel credit card and also bought $65.17 in fuel with the company-issued Visa credit card.

23.  When Plaintiff exceeded the $200 monthly gas allowance, later paychecks were reduced to account for the overage.  For example, by the end of August 2005, Plaintiff was more than $200.00 over the allowance and $50.00 per pay period was taken from Plaintiff's check beginning with the pay period ending September 12, 2005.  For the pay period ending February 12, 2006, Plaintiff had $413.73 of excess fuel charges deducted from his pay check which, along with the other deductions, resulted in a net paycheck of $216.35 for a two week period.  Plaintiff questioned and complained about the amount of his pay and the deductions from his paycheck.  In response he would receive notations on his pay stub which indicated the reasons for the deductions, but Plaintiff generally remained dissatisfied with the responses.[3]

_____

[3]Interestingly, Plaintiff's pay stubs do not indicate Plaintiff's annual salary or pay rate, even though on some of the pay stubs there is a section on the stub for the pay rate.  (Def. Ex. 9).  Plaintiff testified that it took him a few months to discover that he had not been paid the hourly rate he was promised because the pay stubs were confusing to him and contained various deductions.  It appears to the Court that by the time Plaintiff became fully aware of what was going on, he was in a position not unlike that of a coal miner who owed his soul to the company store in that he was living in an

10

24. It is also clear from the evidence and the inference that can be drawn from the evidence that Plaintiff repeatedly misused his company-issued credit cards in that he used them for other than business reasons. For example, the July 2005 fuel card statement indicates that Plaintiff purchased fuel at 9:56 p.m. on July 11, 2005 and then made a separate purchase of fuel three minutes later. That same statement also shows that Plaintiff used the company fuel card to buy gas on Saturday, July 16, 2005 and again on Sunday, July 17, 2005, neither of which was a work day. The August 2005 fuel card statement also shows that Plaintiff bought gas at 6:06 p.m. on Sunday, August 7, which was not a work day, and then again the next morning, on Monday, August 8, at 8:31 a.m. In February 2006, Plaintiff made personal purchases at Cloud Nine, Papa John's, Las Palmas Mexican Restaurant, and the Nashville Pizza Company. By March 2006, Plaintiff had over $800 in charges on the company Visa card, including purchases at a Scot Market and a Subway on March 27, 2006, a day on which Plaintiff was not at work, allegedly due to sickness.

25. The excess amount charged in March 2006 for personal use and excess fuel was so large that in preparing the payroll, Judy Blair had to spread the deductions from Plaintiff's paycheck to recoup these personal charges over three pay periods. To help offset the administrative time it took to add Plaintiff's personal charges, subtract his business charges, and reconcile the amount owed per pay period, Defendants, at one point, charged Plaintiff ten dollars per pay period to prepare his paycheck.

26. Plaintiff was also responsible for the misuse of a cell phone which had been given to him by a co-worker and was supposed to be returned to the company by Plaintiff. At some point while Plaintiff was in possession of the cellphone, his girlfriend used the cellphone to run up hundreds of

_____

apartment rented from Robert Blair and paying for a truck which Westwood had purchased for Plaintiff's use.

minutes in calls over several months. Plaintiff was aware that his girlfriend was using the cellphone as evidenced by the fact that the phone records show calls made from that cellphone to Plaintiff's cellphone and vice versa. As with the excess credit card charges, the amount charged to Westwood for those minutes was deducted from Plaintiff's pay in accordance with the agreement Plaintiff signed with Westwood.

27. In January 2006, due at least in part to Plaintiff's misuse of the fuel card, Westwood decided to cancel the fuel cards and give all the maintenance employees a $200.00 per month increase in wages to cover the costs of fuel. That increase became effective in February 2006.[4]

28. In April 2006, Robert Blair cancelled Plaintiff's Visa card because it had been repeatedly misused. Without a fuel card or a Visa card, Plaintiff then began using the company's Home Depot card to make unauthorized fuel purchases at Home Depot. For example, in April 2006, Plaintiff used the Home Depot card to buy over $450 in fuel. Westwood cancelled Plaintiff's Home Depot card in May 2006. However, Plaintiff retained possession of the cancelled credit card and was still able to use the credit card for fuel purchases at Home Depot. In the months of May through August 2006, Plaintiff purchased over $600 in fuel at Home Depot using his cancelled card, without Westwood's consent.

29. Initially, Westwood did not know who was using the Home Depot card for the purchase of fuel and Pulk spent a great deal of time investigating the matter. Pulk found out Plaintiff was responsible for the charges when Plaintiff observed Pulk pouring over Home Depot charges in the office and Plaintiff admitted that the charges were his.

------

[4]While Plaintiff received a $100 increase for each pay period, this will not be included in the Court's calculation of overtime pay because the $100 was not actually income, but rather was to offset the amount of money the employees were paying for gasoline in order to perform Westwood's business.

12

30. Upon learning that Plaintiff was responsible for the Home Depot charges, Pulk prepared an "Employee Violation Acknowledgment" dated October 4, 2006. That violation form indicated that the credit card was cancelled, but Plaintiff discovered that he could still use the card at the fuel pumps. The violation form also indicated that $607.47 had been charged on the cancelled card and that "[m]ore bills might be coming in." (Pf. Ex. 22). Plaintiff signed the form and wrote out no explanation or rebuttal to the charges. This was the first written document about Plaintiff's use or misuse of the company's credit cards.

31. The October 4, 2006 violation notice was the third written violation notice that Plaintiff received in 2006. The first was dated January 5, 2006, although it is unsigned and Plaintiff claims he never saw it before this lawsuit was filed. This violation notice was issued because Plaintiff had failed to show up on a job site and could not be reached by phone after he called to say he would be in around 10 a.m.

32. The second violation notice is dated May 22, 2006. Pulk gave this violation notice to Plaintiff after Plaintiff failed to show up for work, failed to call in, and failed to answer the phone. Because Plaintiff had tools in his truck that were needed for a job, Pulk drove to Plaintiff's apartment to find him and retrieve the tools. Plaintiff signed the May 22, 2006 notice, but again wrote nothing to explain or rebut the company's statement of violation.

33. Plaintiff was absent from work for five days during this period in late May 2006. He had 19 other absences during 2006: January 1 and 30, February 17, March 7, 27, 28, and 29, April 10 and 24, May 22, July 13, 17, and 24, October 20 and 23, and November 6, 7, 8, and 9.

34. When a maintenance employee is unable to come to work, the employee is required to call in and notify Pulk of his absence. On at least five occasions in 2006 (May 22, July 17, July 24,

13

Case 3:07-cv-00955   Document 44   Filed 05/12/09   Page 13 of 36 PageID #: 245

November 8, and November 9) Plaintiff did not call in to report his absences and he was therefore a "no call no show" on those dates. The January 5, 2006 and the May 22, 2006 violation notices were issued for that reason.

35. As indicated, Plaintiff was absent from work for four consecutive days in November 2006 (November 6-9). On the first two of those days, Plaintiff called in to tell Pulk that he was sick. However, Pulk testified that on both of those days, he called Plaintiff back in the afternoon, and Plaintiff did not sound ill or sick to Pulk. After speaking with Plaintiff on the afternoon of November 7, 2006, Pulk expected Plaintiff to be at work the next day. Likewise, Pulk spoke with Plaintiff on the afternoon of November 8, 2006 and expected Plaintiff would be to work the following day. However, Plaintiff did not come to work or call in either day. When Plaintiff was absent for a fourth consecutive day and failed to call in for a second consecutive day, Pulk contacted Robert Blair and recommended that Plaintiff be terminated.[5]

36. This was not the first time Pulk had made such a recommendation. Rather, in May or June 2006, Pulk recommended that Plaintiff be discharged because of his performance problems (including attendance issues and call in issues), and abuse of company credit cards. Robert Blair did not agree to Plaintiff's termination at that time and told Pulk that Westwood should have a replacement before Plaintiff was fired. Subsequently, at the end of August 2006, Westwood hired Blackmon to replace Plaintiff.

37. Blair agreed to Plaintiff's termination in November 2006 and told Pulk to call Plaintiff and tell him that he was being terminated. In an effort to make sure that Plaintiff returned the truck,

---

[5]At around this same time, Pulk told Blackmon that he had not heard from Plaintiff, and on the day of the termination, Pulk said that Plaintiff had not called in and that they would be terminating Plaintiff's employment.

Blair told Pulk to tell Plaintiff that if he did not return the truck, the company would notify the police.

38. Plaintiff returned the truck on November 12, 2006. He was told at the time that he could have the truck if he paid off the balance. Plaintiff was unable to do so, and the truck remained on the parking lot at Westwood for the next several months. What happened to the truck after this point in time is unclear from the record; however, there was some suggestion from the evidence that another employee may have purchased the truck.

39. When Plaintiff returned the company truck he was handed a Separation Notice stating that he was terminated on November 9, 2006. The Separation Notice indicated Plaintiff's occupation as "handyman." Attached to the Separation Notice was an "Explanation for Separation," signed by "Judy K. Blair, Co-owner/HR Manager."[6] It stated that Greene was terminated for too many missed days, for not showing up or calling in, and for misusing the company-issued Home Depot, Visa and gas credit cards and cell phone.

40. Plaintiff claims that his firing was in retaliation for complaining about not being moved to an hourly rate and the fact that he had met with an attorney. Specifically, Plaintiff claims that he complained to Robert Blair in September 2006 about not being paid at an hourly rate and that the employees should record their time on a time clock. After this time, Plaintiff claims his work was unduly criticized and he began to receive complaints. Plaintiff also claims that on Wednesday November 8, 2006, he told Pulk on the phone that he had gone to see a lawyer about his truck and his pay.

_____

[6] Judy Blair testified that she listed the title of "Co-owner/HR Manager" because she understood that she had to put some title on the form. As already indicated, the Court finds that Judy Blair was not involved in the day-to-day operation of Westwood, but rather served primarily as a bookkeeper handling payroll.

15

41.    For their part, Defendants claim that Plaintiff never talked with Robert Blair in September 2006 about becoming an hourly employee or using a time clock to record hours.  Instead, Plaintiff told Robert Blair that he should be given a raise.  As for information about Plaintiff hiring a lawyer, Defendants claim that in early November 2006, Pulk received a phone call from one of Defendant's former girlfriends who indicated that Plaintiff was going to try to sue the company and that Pulk did not tell Robert Blair about this conversation.

42.    Based upon the evidence, the Court finds that in October 2006, Plaintiff did not demand that he become an hourly employee and did not ask Robert Blair to require the maintenance employees to use a time clock.[7]  The Court credits Pulk's testimony that Plaintiff did not tell Pulk that he had hired a lawyer on the day before he was fired.  Although Plaintiff testified that he told his employer that he had hired a lawyer on the day before he was terminated, his deposition testimony is contrary.  While the Court finds it highly unlikely that Pulk did not tell Robert Blair about the phone call from the former girlfriend as both testified, the Court credits Pulk's testimony that he discounted the phone call and attributed it to a "scorned girlfriend."

43.    Based on these findings, the Court finds that Plaintiff was not terminated because he complained about his pay or because he had contacted an attorney.  Instead, Plaintiff's termination was based upon any of a myriad of reasons unrelated to his exercise of a protected right, including his continued absences, his failure to call in, and his misuse of credit cards.

44.    After his termination, Plaintiff worked as a handyman for his company Greene Restoration.  He would pick up jobs on his own, and also worked for "Handy on Call" through which he would receive leads for work and split the money he received from doing the work.  The

---

[7]In any event, and as will be discussed shortly,  use of a time clock would be impractical for the maintenance technicians.

exact amount of money that Plaintiff made after leaving Westwood and until the date of trial is not clear and this is due entirely to Plaintiff not maintaining (or not producing) records. The invoices that he finally produced after numerous requests by Defendants suggest that he earned only about $22,000 for both 2007 and 2008, but this figure is very suspect. The Court cannot determine the precise amount of money that Plaintiff earned since he left his employment. Plaintiff has not filed federal income taxes for at least the past four years, including the years after he was terminated from his employment at Westwood.

## C. Hours Worked By Plaintiff

45. Westwood's practice was to pay its employees twice a month, for work performed through the 12th of the month and through the 27th of the month. However, Westwood did not use a time clock to track its maintenance employees' time because it was said to be impractical. Frequently, the maintenance employees reported to the office early in the morning to review work orders, locate and load materials and equipment for the job, and receive instructions. Other times, the maintenance employees reported directly to a job site from home, without first going to the office where the time clock was located. Sometimes the maintenance employees went directly home from a job site, or would stop by a lumber yard or Home Depot after finishing the project for the day in order to stock up for the next day's work and then go home, without ever returning to the office.

46. Instead of a time clock, the maintenance employees recorded time on a Bi-Monthly Time Report. The actual work performed by an employee on a specific job was listed on a Work Order. The Work Order was used to bill the customers for the time spent on the job.

47. Defendants contend that the Bi-Monthly Time Report was supposed to contain all of the hours worked by an employee for any given two-week period. Plaintiff contends that the Bi-

17

Monthly Time Report was supposed to reflect only the time on the Work Order to be billed to the customer, not the entire time they were working on the jobs. The Court finds that the truth lies somewhere in between. While the intent of the Bi-Monthly Time Report may have been to record all time worked, it is clear from the evidence that not all of the hours actually worked were contained on the Report, and Defendants were aware that not all hours worked by the employees were listed on the Report. This is evidenced by the fact that Pulk knew when employees arrived at the office in the mornings to begin their work before proceeding to the job sites, he later collected the Bi-Monthly time reports from the employees, and he should have noticed that the Bi-Monthly Time Reports did not reflect the actual time that employees were regularly showing up at the office to begin their work. 48. Plaintiff testified he would typically report to work by 7:15 a.m. for a workday which began at 8:00 a.m. on the time reports. Upon arriving, Plaintiff and others would talk among themselves, have coffee, and discuss with Pulk the day's work orders and schedule, and load their trucks with the material and equipment from the warehouse necessary for the day's work projects. On some occasions, Plaintiff would have to leave the job site to obtain material or stop after work for supplies or to unload the truck at the office, and those times would not be recorded on the time records or work orders. Blackmon also testified that these hours were often not reflected on the Bi-Monthly Time Reports. There is also evidence that, on some occasions, not all the time spent developing bids and discussing the work was noted on the Bi-Monthly Report since the employees were only allowed to spend two hours or less writing up bids.

49. As indicated, the time allocated by Plaintiff and the other maintenance employees on a particular job was recorded on Work Orders to be sent to the customers. However, the Court has no way of knowing what the Work Orders would show about the work performed and the number

of hours worked by the employees since Defendants claim that the Work Orders, which would be essential to this case, were supposedly destroyed in the normal course of business. This seems illogical for a number of reasons, including the company's desire to maintain records of their work for their customers through the Work Orders for a lengthy period of time, if for no other reason than to be able to use them to address any customer complaints. Interestingly enough, the one Work Order which Defendants were able to produce in response to Plaintiff's discovery requests indicates that Plaintiff actually worked 2 hours that was not recorded on his Bi-Monthly Time Report.

50. It is impossible to determine from the record before the Court the precise number of hours worked off the clock in this fashion, since most weeks on the Bi-Monthly Report also list at least some time for shop work or office work. Further, it is clear that not all of the time in the office was in anticipation of work, but included time spent drinking coffee and socializing. Based upon the conflicting testimony and evidence, the Court finds that a fair estimate of the time not listed on the time sheets for work performed before 8:00 a.m., or for work performed after leaving for the day, amounts to two hours per week by Plaintiff.

51. Defendants assert that the Bi-Monthly Time Reports are the most accurate reflection of the actual hours worked by Plaintiff. However, those Reports indicate that Plaintiff was not paid overtime for many work weeks. The reports reflect the following times for each week worked[8]:

---

[8]There were no Bi-Monthly Time Reports introduced for each of the two-week periods ending September 12, 2005, September 27, 2005 and March 12, 2006 (a total of 12 weeks). For these weeks, as suggested in the proposed findings by the parties, the Court has determined an average 41.5 hours for each week which is based upon the average amount worked in the remaining weeks. This average excludes weeks in which 30 hours or less was reported so as to not downwardly skew the average.

| | | |
|---|---|---|
| **2005** | December 19: 44.5 | June 5: 48.5 |
| June 28: 49 | December 26: 0 | June 12: 47.5 |
| July 4: 41.5 | **2006** | June 19: 44 |
| July 11: 41.5 | January 2: 50.5 | June 26: 47 |
| July 18: 41.5 | January 9: 26 | July 3: 39 |
| July 25: 40 | January 16: 37 | July 10: 33 |
| August 1: 35 | January 23: 42.5 | July 17: 32.5 |
| August 8: 29.5 | January 30: 46 | July 24: 35.5 |
| August 15: 39 | February 6: 48 | July 31: 47 |
| August 22: 40.5 | February 13: 36 | August 7: 39.5 |
| August 29: 41.5 (average) | February 20: 50.5 | August 14: 38.5 |
| September 5: 41.5 (average) | February 27: 41.5 (average) | August 21: 33 |
| September 12: 41.5 (average) | March 6: 41.5 (average) | August 28: 42.75 |
| September 19: 41.5 (average) | March 13: 40 | September 4: 37 |
| September 26: 41.5 (average) | March 20: 21.5 | September 11: 45.5 |
| October 3: 34.5 | March 27: 18.5 | September 18: 45 |
| October 10: 30.5 | April 3: 25 | September 25: 53.5 |
| October 17: 39.5 | April 10: 31 | October 2: 43.5 |
| October 24: 42.5 | April 17: 44 | October 9: 43 |
| October 31: 27.5 | April 24: 50 | October 16: 35.5 |
| November 7: 38 | May 1: 43.5 | October 23: 35.5 |
| November 14: 43 | May 8: 33.5 | October 30: 43 |
| November 21: 19.5 | May 15: 34 | November 6: 0 |
| November 28: 16.5 | May 22: 8.5 | |
| December 5: 49.5 | May 29: 29 | |
| December 12: 45.5 | | |

Based upon the foregoing, there were 173.75 recorded overtime hours for which Plaintiff received no overtime compensation. Of that amount, 24 hours of overtime were performed by Plaintiff before he received his $1,000 increase, and 149.75 hours after the increase went into effect.

52. Plaintiff claims that he worked additional hours, not reflected in the Bi-Monthly Time Reports. In an effort to support his claim, Plaintiff sat down and wrote out the amount of hours that he worked each week based upon his memory and his review of the Bi-Monthly Time Reports. Those hours, as set forth in Plaintiff's Exhibit 18, reflect 362.75 overtime hours for the sixteen months he worked at Westwood.

53. The Court finds that Plaintiff's calculation does not in any way accurately reflect the amount of hours (overtime or otherwise) actually worked by the Plaintiff. Those calculations were made long after the fact and in anticipation of trial. There are many inaccuracies, mistakes, and/or embellishments in Plaintiff's Exhibit 18.

20

54.  For example, for the week of July 4, 2005, the number of hours actually recorded on Plaintiff's Time Report is 41.5, not 51.5 as Plaintiff claims on Plaintiff's Exhibit 18.  For the weeks of December 5, 2005 and December 12, 2005, Plaintiff's claims a total of 108.5 hours when in fact the actual recorded hours show a total of only 86 recorded hours for these two weeks.  For the week of December 19, 2005, Plaintiff's summary claims 56.5 recorded hours, but Plaintiff's Time Report records only 37 hours worked in that week. For the week of January 23, 2006, Plaintiff's Exhibit 18 claims 47 recorded hours, but Plaintiff's Bi-Monthly Time Report for this week records only 42.5 work hours.  For the week of July 10, 2006, Plaintiff's summary claims 41 recorded hours, however, the Time Reports covering this week show only 33 work hours for this week.

55.  These are but a few of the many inaccuracies and misstatements contained in Plaintiff's Exhibit 18 and the Court finds the exhibit to be of no evidentiary value.  Instead, and as has been indicated, the Court finds that the preponderance of the evidence suggests that Plaintiff worked the hours as set forth in the Bi-Monthly Time Reports, plus an average of two more hours per work week.

56.  Apart from claiming that he is entitled to overtime hours, Plaintiff also claims that he is entitled to unpaid commissions on a Dimick project and an LA Weight Loss project for which he submitted bids.   However, the evidence shows that there was no commission agreement implemented by the company when Plaintiff bid on these projects. In fact, the 5% commission structure was just being discussed when Blackmon was hired at the end of August 2006 and this was long after the Dimick project and the LA Weight Loss project for which Plaintiff drew up bids.

21

## II. CONCLUSIONS OF LAW

This case requires the Court to resolve several issues based upon the Court's findings. These issues include whether the individual Defendants, Robert and Judy Blair are liable under the FLSA, whether Plaintiff was an exempt or non-exempt employee under the FLSA, whether Defendants' conduct was willful and/or in good faith, whether Defendants retaliated against Plaintiff in violation of the FLSA, and the amount of damages and interest to which Plaintiff is entitled.

### A. Individual Liability

A person cannot be held individually liable for violating the overtime provisions of the FLSA unless he or she is an "employer" within the meaning of the FLSA. 29 U.S.C. § 207(a)(1). Under the FLSA, "[e]mployer includes any person acting directly or indirectly in the interest of any employer in relation to an employee[.]" 29 U.S.C. § 203(d). "There may be multiple 'employers' who are simultaneously liable for compliance with the FLSA." Chad v. Hotel Oasis, Inc., 493 F.3d 26, 34 (1st Cir. 2007).

"The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." Donovan v. Agnew, 712 F.2d 1509, 1511 (1st Cir. 1983). This is commonly known as the "economic reality" test and has been adopted by the Sixth Circuit. Fegley v. Higgins, 19 F.3d 1126, 1131 (6th Cir. 1994).

"[I]n order to qualify as an employer for this purpose, an officer 'must either be involved in the day-to-day operation or have some direct responsibility for the supervision of the employee.'" Alvarez Perez v. Sandford-Orlando Kennel Club, Inc., 515 F.3d 1150, 1160 (11th Cir. 2008)(citation omitted). "[T]he overarching concern is whether the alleged employer possessed the power to

22

control the workers in question," and the factors to be considered in making this determination include "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." Herman v. RSR Sec. Serv., Ltd., 172 F.3d 132, 139 (2d Cir. 1999)(citation omitted). No one factor is dispositive, but instead, a court should consider the totality of the circumstances in determining whether an individual is an employer within the meaning of the FLSA. Id.

In this case, it is clear that Robert Blair was an employer for purposes of the FLSA, and, in their proposed findings, Defendants do not contend otherwise. An individual, like Robert Blair, who is the chief executive officer of a company, has a significant ownership in the company, controls significant functions of the business, and determines salaries and makes hiring and firing decisions is an employer and individually liable under the FLSA. Dole v. Elliot Travel & Tours, Inc., 942 F.2d 962, 965 (6th Cir. 1991).

While Robert Blair may be deemed individually liable under the FLSA, the same cannot be said about Judy Blair. The evidence shows that after the initial forming of Westwood in 2002, Judy Blair was not a corporate officer. The evidence also shows that Judy Blair did not set salaries or hire and fire employees. Further, she had no operational control over the business and she did not have any supervisory authority. As such, Defendant Judy Blair was not an employer under the FLSA and she is therefore not liable for any damages assessed under the FLSA. Further, because Plaintiff provides no basis for holding Defendant Judy Blair liable under any of the other claims he has advanced, the claims against that Defendant will be dismissed.

23

**B. <u>Exempt or Non-Exempt Employee</u>**

The FLSA requires that employers ordinarily pay their employees time and one-half for work exceeding forty hours per work-week. 29 U.S.C. § 207(a)(1). The FLSA provides exemptions from overtime for persons "employed in a bona fide executive, administrative, or professional capacity" and grants the Secretary of Labor broad authority to promulgate regulations to "define[] and delimit[]" the scope of the exemption. 29 U.S.C. § 213(a)(1). An employer who claims an exemption from the FLSA has the burden of showing that the exemption applies and any exemption is narrowly construed against the employer. <u>Martin v. Indiana Michigan Power Co.</u>, 381 F.3d 574, 578 (6th Cir. 2004).

In this case, Defendants argue that they were not responsible for paying overtime to Plaintiff pursuant to the executive or administrative exemption. However, Defendants have failed to establish that Plaintiff met either exemption and the Court's findings show otherwise.

The federal regulations define "management" as follows:

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102. An employee is employed in a "bona fide administrative capacity" if he is a salaried employee, his "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's

24

customers" and his "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200.

Although Defendants characterize Plaintiff as the "Project Manager/Lead Maintenance Technician," the Court has found that Plaintiff did not function as such. Regardless, a "job title alone is insufficient to establish the exempt status of an employee." 29 C.F.R. § 541.2. Instead, "[t]he FLSA requires the employer to make FLSA exemption decisions based on the employee's actual job duties, not the employee's job title[.]" Martin, 381 F.3d at 585-86. An employer "may not rely on incorrect information in the face of its actual knowledge of [an employee's] job activities." Id. at 586.

In this case, Plaintiff's actual job duties were that of a maintenance man (or, as stated in his Separation Notice, that of a "handyman"), not that of a bonafide executive or administrator. Plaintiff was a manual laborer, not an office employee. He rarely exercised any discretion or used independent judgment with respect to any matter of significance, outside of the maintenance work described in the work orders. Plaintiff did not interview, select or train employees, or set their rates of pay and hours to be worked. He did not direct the work of others and only rarely took the lead on a project when other workers were sent to help him finish the job. Plaintiff did not appraise other's work, nor discipline employees. He did not plan or control the budget, and only rarely determined the type of materials or supplies to be used. As such, the Court finds Plaintiff was a non-exempt employee and therefore entitled to overtime compensation for work in excess of forty-hours per week.

**C. Willful Violation and Good Faith Under The FLSA**

"Under the FLSA, a lawsuit to recover unpaid compensation must be commenced within two years after the cause of action accrued," unless the cause of action arose out of a willful violation, in which case the lawsuit must "be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a)." Hughes v. Region VII Area Agency on Aging, 542 F.3d 169, 187 (6th Cir. 2008)(quoting, 29 U.S.C. § 255(a)). "Violations are willful if 'the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.'" Herman v. Palo Group Foster Home, Inc., 183 F.3d 468, 474 (6th Cir. 1999) (citing, Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 128-29 (1985)).

In addition to the willfulness provision which extends the statute of limitations to three years, the FLSA contains a liquidated damages provision. Under 29 U.S.C. § 260, an employer is liable for liquidated damages in an amount equal to the unpaid wages unless "the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not in violation of the [FLSA]."

The issue of good faith is "closely related" to willfulness insofar as it evidences the employer's intent either to violate or not violate the law. Herman, 183 F.3d at 472. "For the willfulness issue on which the statute of limitations turns, the burden is on the employee; for the good faith issue on which liquidated damages turns, the burden is on the employer." Rodriguez v. Farm Grocery, Inc., 518 F.3d 1259, 1274 (11th Cir. 2008). "Because the burden of proof is placed differently, a finding that willfulness was not present may co-exist peacefully with the finding that good faith was not present." Id. However, the converse finding – that the employer was willful –

26

"precludes the court from finding that the employer acted in good faith when it decides the liquidated damages question."  Alvarez Perez, 515 F.3d at 1166.

In McLauglin v. Richland Shoe Co., 486 U.S. 128, 133 (1988), the Supreme Court indicated that to show willfulness, a plaintiff must show that "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." The Supreme Court reasoned:

> In common usage the word "willful" is considered synonymous with such words as "voluntary," "deliberate," and "intentional." The word "willful" is widely used in the law, and, although it has not by any means been given a perfectly consistent interpretation, it is generally understood to refer to conduct that is not merely negligent[.]
>
> . . . .
>
> If an employer acts reasonably in determining its legal obligation, its action cannot be deemed willful . . . .   [Even] [i]f an employer acts unreasonably, but not recklessly, in determining its legal obligation  . . . [its conduct is not willful]."

Id. at 135 n.13.  The regulations define reckless disregard as the "failure to make adequate inquiry into whether conduct is in compliance with the Act." 5 C.F.R. § 551.104.

In this case, the Court concludes that Defendants' actions in incorrectly categorizing Plaintiff as an exempt employee and in failing to pay Plaintiff overtime was willful.  Throughout his employment, Plaintiff performed tasks identical to those performed by the hourly maintenance technicians and there was no real difference between their duties and those of Plaintiff.  Both Robert Blair and Pulk knew that Plaintiff was not performing as a bona fide executive, nor was he acting in an administrative capacity.  Pulk was essentially the Project Manager.  Plaintiff was simply a general laborer and Defendants knew or should have known that he was required to be paid an hourly rate.  See, Allen v. Bd. of Educ. for Bibb Cty., 495 F.3d 1306, 1324 (11th Cir. 2007)("[t]he

27

three-year statute of limitations may apply even when the employer did not knowingly violate the FLSA; rather it may apply when it simply disregarded the possibility that it might be violating the FLSA").[9]

The Court's conclusion relating to willfulness effectively disposes of the good faith and liquidated damages issues.  See, Herman, 183 F.3d at 474 ("a finding of willfulness is dispositive of the liquidated damages issue").   Regardless, the Court also concludes that Defendants have not carried their "substantial burden" to show that they acted in good faith which "requires 'proof that [the employer's] failure to obey the statute was *both* in good faith and predicated upon . . . reasonable grounds[.]" Elwell v. Univ. Hosp. Home Care Serv., 276 F.3d 832, 840 (6th Cir. 2002).

  "The employer has an affirmative duty to ascertain and meet the FLSA's requirements, and an employer who negligently misclassifies an employee as exempt is not acting in good faith." Martin, 381 F.3d at 584.   "'The fact that an employer has broken the law for a long time without complaints does not demonstrate the requisite good faith required by the statute.'" Martin v. Cooper Elec. Supp. Co., 940 F.2d 896, 908 (3d Cir. 1991)(citation omitted).

The evidence shows that Defendants made no apparent effort to determine whether their classification was correct, and they failed to do so even after Plaintiff had been employed for an extended length of time, was obviously not performing any managerial or supervisory duties, and complained about his wages.   Thus, the three-year statute of limitations applies and Plaintiff is

_____

[9]The evidence suggests that Defendants may not have been overly concerned with finding out or complying with the law generally, as evidenced by their failure to include the amount deducted for Plaintiff's rent and truck payments in Plaintiff's total gross wages.  While this does not show any intent to disregard the FLSA, it does suggest a rather cavalier attitude in complying with their obligations to properly record wages for payroll and income tax purposes.  See, Chad, 493 F.3d at 35 (failure to keep adequate records and intentional manipulation of records supports willfulness finding).

entitled to liquidated damages which is the "norm" and not the exception in failure to pay overtime cases.  See, Martin, 381 F.3d at 584.

## D.  **Retaliation Under the FLSA**

The FLSA prohibits an employer from retaliating against an employee who has engaged in a right protected by the Act.  Specifically, the FLSA mikes it unlawful for an employer to fire an employee who has filed an FLSA complaint against the employer, instituted a procedure against the employer under the FLSA, or testified in any proceeding brought under the FLSA.  29 U.S.C. § 215(a)(3).  The Sixth Circuit has held that "to satisfy the 'complaint requirement,' the plaintiff need not file a formal complaint with the Equal Employment Opportunity Commission; the lodging of a complaint with the employer is sufficient."  McDaniel v. Transcender, LLC, 119 Fed. Appx. 774, 779 (6th Cir. 2005).

Where, as here, an employee has no direct evidence of retaliation, the employee may seek to establish his retaliation case utilizing the familiar burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Thus, Plaintiff must first establish a *prima facie* case of retaliation.  Once a *prima facie* case is established, the burden shifts to Defendants to articulate legitimate non-discriminatory reasons for their decision.  Finally, the burden shifts back to Plaintiff to show that the articulated reasons were a pretext or a lie.  McDaniel, 119 Fed. Appx. 774.

In this case, Plaintiff has failed to establish a *prima facie* case.  A *prima facie* case requires a showing that not only did the employee engage in activity protected by the FLSA, his termination was a causal result of engaging in such activity.  Id.  While the evidence shows that Plaintiff complained throughout his employment about his wages, Plaintiff has failed to establish that his

29

termination was a result of those complaints. In attempting to do so, Plaintiff argues that immediately before his termination, he told Pulk that he had hired an attorney to look into the issues of his pay and his truck. However, the Court has found as a fact that this did not occur. Further, while Plaintiff's former girlfriend called and told Pulk that Plaintiff was contemplating suing Westwood, this was not a complaint made by the employee to the employer and, in any event, Pulk brushed this off as being an attempt by the girlfriend to get back at Plaintiff.

Even if Plaintiff had established a *prima facie* case of retaliation, Defendants articulated several legitimate non-discriminatory reasons for his termination, none of which Plaintiff has shown to be a lie. Throughout his employment, Plaintiff repeatedly and consistently misused the company credit cards for his own personal use. Indeed, when his company fuel card, Visa card, and Home Depot cards were cancelled, Plaintiff still found a way to manipulate the system and use his cancelled Home Depot card to purchase fuel. Plaintiff also allowed a company cellphone to be repeatedly used by his girlfriend for personal calls for several months.

Plaintiff also was an unreliable employee. He repeatedly failed to show up for work, or to call and tell his employer that he would not be coming to work. Even after being warned about failing to call in when he would be absent, Plaintiff failed to call in for the last two days of his employment at a time when he had already been out for two days.

In short, while Plaintiff's termination was a long time in coming, it was not in retaliation for any complaints Plaintiff may have had about his pay. Instead, Westwood had finally had enough of Plaintiff's continued abuse of the system and his failure to show up for work.

**E.  Damages and Interest**

Based upon the foregoing findings and conclusions, Plaintiff is entitled to an award of damages and interest.  In this regard, the Court must consider whether Plaintiff is entitled to damages for unpaid wages, unpaid overtime compensation, liquidated damages, monies paid for the truck, and prejudgment or post-judgment interest.

**1.  Unpaid Wages and Commissions**

In his Complaint and the Pretrial Order, Plaintiff contends that he is entitled to  recover unpaid wages on a breach of contract theory.  However, in his proposed findings and conclusions, Plaintiff appears to have abandoned this claim because he proposes damages only for overtime compensation and the monies he paid for his truck and does not articulate a basis for the payment of unpaid regular wages.  Moreover, at trial, Plaintiff offered no competent evidence which would support the conclusion that he is entitled to any compensation for unpaid regular hours.  The Court has no basis to conclude that Plaintiff is entitled to be paid for any unpaid regular hours, as opposed to overtime hours, and the time records which were received in the evidence were totally inconclusive and contradictory on this issue.

The Court will also not award any damages for unpaid commissions.  While Plaintiff did in fact draw up bids for the LA Weight Loss and Dimick projects, the evidence is clear that the proposed commission structure of 5% did not come into effect until shortly before Plaintiff's termination and long after Plaintiff had completed those bids.

**2.  Overtime Wages and Liquidated Damages**

This Court has found as a matter of fact and law that Plaintiff was a non-exempt employee and therefore entitled to compensation at the rate of one and one-half of his hourly rate for each hour

worked in excess of forty hours per week. Prior to his $1,000.00 raise on October 15, 2005, Plaintiff had an effective hourly rate of $16.15 per hour and an overtime rate of $24.23. After his raise, Plaintiff's effective hourly rate was $16.63 and his overtime rate was $24.95.

Based upon the Bi-Monthly Time Reports, Plaintiff had 24 hours of overtime for which he was not paid prior to his wage increase. He is entitled to one and one-half times his hourly rate for those hours for a total of $581.52 (24 hrs. x $24.23). Plaintiff also had 149.75 hours of overtime after his pay raise went into effect and he is entitled to $3,736.26 (149.75 hrs. x $24.95) for that uncompensated time.

The Court has also found that Plaintiff is entitled to two additional hours per week for each week that he worked for Westwood for the time spent at the office before the 8:00 a.m. hour designated on the Bi-Monthly Time Reports, or the time spent after work, which were not recorded on the Time Reports. For many of those weeks, Plaintiff did not work 38 or more hours and therefore he is entitled to no overtime for those weeks. However utilizing the two hour per week figure, for the seventeen weeks prior to his raise Plaintiff had 23 hours of additional overtime, meaning that he is entitled to $557.29 (23 hrs. x $24.23) for that time. For the forty-eight weeks after his raise, again utilizing the two hour per week formula, Plaintiff had an additional 48 hours in uncompensated overtime and he is therefore entitled to $1,197.60 (48 hrs. x 24.95).

In summary, Plaintiff is entitled to a total award of $6,072.67 for uncompensated overtime wages. In addition, pursuant to 29 U.S.C. § 216, Plaintiff is entitled to "an additional equal amount" as liquidated damages. Therefore, Plaintiff will be awarded $12,145.34 for Defendants' failure to pay overtime in accordance with the FLSA.

32

### 3. Truck Payments

In his proposed findings, Plaintiff seeks damages in the amount of $7,910.67 for the amount he paid towards the purchase of the Chevrolet truck. He cast that claim in terms of improper deductions taken from his pay. However, the Complaint which Plaintiff filed does not state a claim for reimbursement of his truck payments, and indeed the prayer for relief only contains a claim for unpaid wages, overtime payment, liquidated damages, attorney's fees and interest. In the Pretrial Order, the Plaintiff seeks recovery of the payments he made on the truck, but does not set forth the precise basis for this claim, other than coupling it with the statement that improper deductions were taken from his pay.

It is clear from the evidence presented that Plaintiff agreed to have $400 taken from his check as payment towards the purchase of the truck. Plaintiff also agreed that he would continue to make those payments until such a time as the truck had been paid for, at which time he could purchase the truck for $1.00. The parties clearly understood these terms and there were no unauthorized deductions taken from Plaintiff's pay check for the truck.

In accordance with Rule 15(b)(2) of the Federal Rules of Civil Procedure,[10] the Court has considered the possibility that Plaintiff is seeking to recover damages for payments he made on the truck under an unjust enrichment theory. "The elements of an unjust enrichment claim are: 1) '[a] benefit conferred upon the defendant by the plaintiff,'; 2) 'appreciation by the defendant of such benefit'; and 3) 'acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof.'" Freeman Indus. LLC v. Eastman

---

[10]In pertinent part, that Rule provides "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." Fed. R. Civ. P. 15(b)(2).

33

Chemical Co., 172 S.W.3d 512, 525 (Tenn. 2005)(citation omitted). "The most significant requirement of an unjust enrichment claim is that the benefit to the defendant be unjust." Id.

It is clear from the evidence that the parties did not reach an agreement as to what would happen were Plaintiff to leave his employment prior to the time that he had made all the payments on the truck, notwithstanding the purported (and unsigned) contract handwritten by Robert Blair. Arguably, it would be unjust for Defendants to retain all of the payments which were made on the truck by the Plaintiff given that Plaintiff made substantial payments, yet Defendants ended up with the truck. By the same token, however, it would not be just to allow Plaintiff to recover all of the payments that he made on the truck, since the truck was used not only for the business purposes of Westwood, but also for Plaintiff's personal use for a period of more than a year.

Having made those observations, the Court will not allow Plaintiff to recover any monies he paid for the truck. As indicated, Plaintiff in his proposed findings seeks to recover payments on the truck in the amount of $7,910.67. However, Plaintiff made nowhere near that amount in payments; instead he made payments totaling $4,800.00.[11] The Court has no evidence of the value of the truck at the time it was relinquished by the Plaintiff or the condition of the truck and no evidence as to the benefit Defendants may have received. It is incumbent upon Plaintiff seeking to recover on an unjust enrichment theory to prove that he conferred a benefit directly to the Defendants, appreciation of that benefit by the Defendants, and acceptance of such benefit without payment of the value thereof. See, Beudreau v. Larry Hill Pontiac/Oldsmobile/GMC, Inc., 160 S.W.3d 874, 882 (Tenn. Ct. App. 2004); First Nat. of No. America LLC v. Marks, 2004 WL 1114574 at *7 (Tenn. Ct. App.

_____

[11]The $7,910.67 figure is apparently drawn from Plaintiff's Exhibit 10. However, that figure is the balance owed on the truck, not the amount which had been paid on the truck.

2004).   There is no evidence of the benefit, if any,  received by the Defendants in this case and therefore any claim based on an unjust enrichment theory fails for a lack of proof.

### 4.  Interest

In the Pretrial Order, Plaintiff asserts that he is entitled to prejudgment interest.  Long ago, in <u>Brooklyn Savings Bank v. O'Neil</u>, 324 U.S. 697 (1945), the Supreme Court considered the availability of prejudgment interest in FLSA actions and concluded that because liquidated damages and prejudgment interest both compensate an employee for delay in payment, prejudgment interest could not be awarded if liquidated damages are awarded.  In doing so, the Supreme Court wrote:

> To allow an employee to recover the basic statutory wage and liquidated damages, with interest, would have the effect of giving an employee double compensation for damages arising from delay in the payment of the basic minimum wages . . . Congress by enumerating the sums recoverable in an action under Section 16(b) meant to preclude recovery of interest on minimum wages and liquidated damages.

<u>Id</u>. at 715-716.  That remains the law.  Since the Court has decided to award liquidated damages in this case, it will not also allow an award of prejudgment interest.

Post-judgment interest is, however, another matter.   While "[c]ourts have held that prejudgment interest is not recoverable on liquidated damages awarded under § 216(b) . . . it is equally clear that post-judgment interest is available 'as a matter of course.'" <u>Ruggles v. Wellpoint, Inc.</u>, 253 F.R.D. 61, 68 (N.D.N.Y. 2008)(collecting cases).  Indeed, 28 U.S.C. § 1961 specifically provides that post-judgment interest "shall be allowed on any money judgment in a civil case recovered in a district court."  Accordingly, Plaintiff is entitled to post-judgment interest from the date of entry of judgment in this case calculated in accordance with 28U.S.C. § 1961(a) which provides that "interest shall be calculated from the date of entry of the judgment, at a rate equal to

the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calender week preceding, the date of the judgment."

## IV.  CONCLUSION

On the basis of the foregoing, the Court determines Plaintiff has established that he is entitled to overtime compensation under the FLSA in the amount of  $6,072.67 and liquidated damages in an equal amount for a total of $12,145.34.  The Court also determines that Defendants Robert Blair and Westwood Property Management, LLC a/k/a Westwood Management LLC were employers for purposes of the FLSA, and those Defendants are jointly and severally liable for the overtime compensation and liquidated damages under the FLSA.  Plaintiff is entitled to recover no other damages.

Further, Plaintiff's claims against Defendant Judy K. Blair will be dismissed.  Finally, the Court concludes that Plaintiff is not entitled to pre-judgment interest, but that he is entitled to post-judgment interest as provided above.

An appropriate Order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

36